[Crim. No. 6564. In Bank. Jan. 19, 1960.]

THE PEOPLE, Respondent, v. RICHARD LEE INGLE,
Appellant.

Robert H. Cornell for Appellant.

Stanley Mosk, Attorney General, G. A. Strader, Doris H. Maier and Robert K. Puglia, Deputy Attorneys General, for Respondent.

WHITE, J.—Richard Lee Ingle and three codefendants were jointly charged with violations of section 11500 of the Health and Safety Code following their arrest on January 22, 1958, in the city of Madera. One of the codefendants, Armando Garcia, pleaded guilty. The other defendants pleaded not guilty and were jointly tried before a jury, which returned verdicts against them. Ingle was convicted of the unlawful possession (count I) and the unlawful selling, furnishing and giving away (count II) of a narcotic, to wit: marijuana, the sentences being ordered to run concurrently. This appeal is by Ingle alone.[1]

Ingle urges that his arrest and search were illegal because not based upon reasonable or probable cause and that the evidence produced by the search was therefore inadmissible; that the evidence was insufficient to sustain his conviction; that he was prejudiced by remarks of the court to the jury; that he was deprived of his constitutional rights as to the assistance of counsel and the production of witnesses.

Ingle was arrested on the evening of January 22, 1958, at about 8:25 by Officers Daulton and Jones of the Madera Police Department. He was sitting with Raymond Adame in a 1948 maroon colored Chevrolet club coupé which was parked in front of the premises at 915 Sonora Street, Madera. They were ordered out of the car by the officers, placed under arrest and

---

[1]The judgment of conviction of codefendant Adame was affirmed in April, 1959. (*People* v. *Adame,* 169 Cal.App.2d 587 [337 P.2d 477].)

searched. There was no warrant for their arrest. The circumstances leading to the arrest and search were these:

On three prior occasions in that month, namely on January 2, 15 and 17, purchases of marijuana cigarettes had been made by undercover agent Nicholson of the State Bureau of Narcotic Enforcement from Garcia. On the night of January 22 Nicholson again purchased marijuana cigarettes from Garcia. On each of these occasions the same general plan of operation was followed. Nicholson would obtain money from Inspector Shoemaker of the state bureau with which to make the purchases, he would then drive to Garcia's house, Garcia would come to Nicholson's car, the latter would give Garcia this money for the purpose of purchasing marijuana, Garcia would take the money and leave, returning in 15 or 20 minutes. On his return he would hand marijuana cigarettes to Nicholson, always retaining one or two for himself as his ''commission'' from Nicholson's purchase, stating that the person from whom he obtained the cigarettes always gave him a similar ''commission.'' Garcia's car was a 1948 maroon colored Chevrolet. It is not disputed that the automobile in which Ingle and Adame were seated at the time of their arrest was that used by Garcia in these transactions. On the night of the 17th and again on the 22nd Inspector Shoemaker while keeping the Adame premises under observation, saw Garcia's car pull into the driveway in front of Adame's house, observed someone leave the Adame house and approach the car on the driver's side, and observed that shortly thereafter the car would leave. On the night of the 17th there were two separate trips made by Garcia to purchase cigarettes for Nicholson, and Garcia's Chevrolet was twice observed in the Adame driveway at those approximate times. The time during which Nicholson waited for Garcia to return coincided with the time required for him to make the trip to Adame's house and return. The cigarettes contained marijuana.

On the night of the 22nd Nicholson again met Garcia at the latter's premises and stated he wanted to buy marijuana, giving him an envelope containing $20 in currency. This money, consisting of two $5.00 and ten $1.00 bills, had been placed in this envelope by Inspector Shoemaker after the serial numbers thereon had been listed and each bill marked with green fluorescent crayon and orange fluorescent powder. At approximately 7 p.m. Garcia received this envelope and departed. He returned about 8:10 p.m. About 7:15 Garcia's car was seen pulling into Adame's driveway, someone approached the car

and after a short delay the car left. When Garcia returned to Nicholson's car, he handed him 36 marijuana cigarettes, keeping 2 as his "commission." At that moment Nicholson signaled waiting police officers Daulton and Jones that the marijuana had been delivered. Garcia was immediately arrested. He had returned on foot, his car was not in the driveway, and the officers set out at once to look for it. A few minutes later they found it half a block away occupied by defendants Adame and Ingle, whom they immediately arrested.

At that moment the officers knew all of the facts just related. They knew that Adame was a peddler and user of marijuana. He was definitely implicated in the Nicholson purchases, and the presence of himself and his companion in the car at that particular time and place, under all of these circumstances, motivated the officers in making the arrest and search of both men, although they had no previous knowledge as to Ingle. They searched Adame first, finding in his possession 12 marijuana cigarettes, plus a partly smoked marijuana cigarette, and a coin purse with several $1.00 bills in it. The search of Ingle revealed two $5.00 and ten $1.00 bills, and, among other things, a key to Ingle's apartment located at 210 North C Street, Madera. Later search of this apartment, with the consent of Ingle's wife, revealed a large quantity of marijuana. Immediately following the arrest both Adame and Ingle were checked under an ultraviolet light and were found to have orange fluorescent powder on their hands. Traces of the powder were also found on Ingle's wallet.

Reasonable or probable cause for an arrest has been the subject of much judicial scrutiny and decision. There is no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances (*Go-Bart Importing Co.* v. *United States,* 282 U.S. 344, 357 [51 S.Ct. 153, 75 L.Ed. 374] ; *People* v. *Washington,* 163 Cal.App.2d 833, 844 [330 P.2d 67] ; *People* v. *Ambrose,* 155 Cal.App.2d 513, 521 [318 P.2d 181])—and on the total atmosphere of the case. (*People* v. *Scott,* 170 Cal.App.2d 446, 452 [339 P.2d 162] ; *People* v. *Denne,* 141 Cal.App.2d 499, 506-507 [297 P.2d 451] ; citing *United States* v. *Rabinowitz,* 339 U.S. 56, 63 [70 S.Ct. 430, 94 L.Ed. 653].) Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. (*People* v. *Fischer,* 49 Cal.2d 442, 446 [317 P.2d 967] ; *People* v. *Kilving-*

*ton,* 104 Cal. 86, 92 [37 P. 799, 43 Am.St. Rep. 73] ; *People* v. *Silvestri,* 150 Cal.App.2d 114, 117 [309 P.2d 871] ; *People* v. *Soto,* 144 Cal.App.2d 294, 298 [301 P.2d 45] ; *People* v. *Smith,* 141 Cal.App.2d 399, 402 [296 P.2d 913] ; *People* v. *Rodriguez,* 140 Cal.App.2d 865, 869 [296 P.2d 38].) ▮ Probable cause has also been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt. (*People* v. *Nagle,* 25 Cal.2d 216, 222 [153 P.2d 344] ; *People* v. *Novell,* 54 Cal. App.2d 621, 623-624 [129 P.2d 453] ; *Ex parte Heacock,* 8 Cal.App. 420, 421 [97 P. 77].) It is not limited to evidence that would be admissible at the trial on the issue of guilt. (*People* v. *Boyles,* 45 Cal.2d 652, 656 [290 P.2d 535].) The test is not whether the evidence upon which the officer acts in making the arrest is sufficient to convict but only whether the person should stand trial. (*People* v. *Fischer, supra,* 49 Cal.2d 442, 446.)

▮ Where an arrest is lawful the search incident thereto is not unlawful merely because it precedes rather than follows the arrest. (*People* v. *Boyles, supra,* 45 Cal.2d 652, 655 ; *People* v. *Simon,* 45 Cal.2d 645, 648 [290 P.2d 531].) Here the officers testified that the arrest preceded the search. The arrest is not sought to be justified by what the search produced.

▮ There is no merit to the contention of Ingle that the sole ground for his arrest was the fact that he was sitting in an automobile with a known dope user and peddler. The situation presented differs from that in *People* v. *Simon, supra,* 45 Cal.2d 645, on which Ingle relies. It cannot justly be said that these officers arrested Ingle merely because he was sitting in an automobile at night with a known addict, or because the automobile was parked in a neighborhood where the narcotics trade was known to flourish. These arresting officers had just participated in the arrest of Garcia. They knew that a narcotics transaction had just taken place in which Garcia, Garcia's car and Adame's house were directly implicated. They knew that contraband had just been transported in that car. They knew that Adame was not only a peddler but a user. They had reasonable grounds for inferring that the narcotics sold to Nicholson had been purchased from Adame or from someone with whom he was then working. This was not an arrest made merely in good faith but without probable cause. ▮ Good faith alone is not sufficient to justify an arrest without a warrant but, as the United States Supreme Court holds in the recent case of *Henry* v. *United States,* 361

U.S. 98 [80 S.Ct. 168, 4 L.Ed.2d 134] ''probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed.'' The law looks only at the facts and circumstances presented to the officer at the time he is required to act (*People* v. *Murphy,* 173 Cal.App.2d 367, 377 [343 P.2d 273] ; *People* v. *Cantley,* 163 Cal.App.2d 762, 765 [329 P.2d 993] ) though it does examine all of these facts in determining probable cause. There was no conflict in the existence of the facts upon which the officers acted. The difficulty comes in the interpretation of those facts. The trial court found that there was reasonable cause for the arrest, that is, that there was probable cause. Unless it can be said that prudent men in the position of these officers knowing what they knew and seeing what they did would not have had reasonable cause to believe and to conscientiously entertain a strong suspicion that Ingle was violating or had violated the law, the arrest should be held lawful.

·. In *People* v. *Hollins,* 173 Cal.App.2d 88, 92-93 [343 P.2d 174], it is cogently stated that ''Our strong devotion to the cherished principle that the citizen shall not be subjected to unreasonable treatment at the hands of the agents of society must be tempered with some reasonable appreciation of the facts of life and of the great dangers and difficulties which beset the officer of the law in his effort to protect the community from the blighting scourge of the narcotic traffic.'' (See also *People* v. *West,* 144 Cal.App.2d 214, 220-221 [300 P.2d 729].)　 ■ 　Police officers are guardians of the peace and security of the community; their problems are manifest and complex and they should not be held to accountability greater than that required of any other reasonable or prudent man under like circumstances.　 ■ 　The exclusionary rule as enunciated in *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513], and the subsequent decisions of this court, is intended ''to protect both the rights guaranteed by the constitutional provisions and the interest of society in the suppression of crime.'' (p. 451.) In view of what the officers saw and knew at the time of Ingle's arrest, it sufficiently appears that it was based upon probable or reasonable cause. The evidence revealed by the search was therefore properly admitted at the trial.

■ 　Review of the record indicates that there was substantial evidence to support the verdict and judgment. The search of Ingle's person revealed the identical money which had been given by Nicholson to Garcia shortly before Ingle's

arrest. His hands and clothing had traces of the orange fluor-
escent powder with which the officers had dusted the marked
money. When informed of this discovery, Ingle remarked
"Well, that's just more evidence." Inspector Shoemaker tes-
tified that he questioned Ingle at the sheriff's office immediately
after the arrest about how he had possession of the money, and
Ingle "stated that when he got into the car the money was
laying on the front seat between him and Adame. I asked
him why he placed the money in his pocket if it did not belong
to him. He stated he was playing a joke and pretended that he
was going to keep the money. I asked him where the money
came from, and he said he did not know, shrugged his shoul-
ders, and said, 'Out of the air.' That was the only explanation
I received of where the money came from." Probation Officer
Hill testified that on March 20, 1958, he had talked with Ingle
at the sheriff's office and during that conversation Ingle told
him that on the evening of January 22, 1958, he had called
Adame by telephone as Garcia owed Ingle $20 and he wanted
to know if Garcia had money; that Adame told Ingle Garcia
did have the money and he would get him; that shortly there-
after while Ingle was in a bar Adame walked into the bar and
got him; they went out to Garcia's car, and Garcia paid Ingle
the $20; then they all got in the car and drove to the house of a
person named Blackie, where Garcia got out and stated he
was going home. While Adame and Ingle were still sitting in
the car they were arrested. Adame told Hill a similar story,
stating that after Garcia got out of the car Ingle counted the
money given to him by Garcia, gave part of it to Adame to
hold, and then when Ingle was putting the money back into
his wallet they were arrested. Ingle did not take the stand in
his own defense. The jury was justified in rejecting either of
these inconsistent versions of where the money came from in
favor of the reasonable inference that he had received the
money from Garcia for marijuana (count II).

With reference to count I, a few days prior to the
arrest Ingle's wife Sondra had rented apartment Number 10
at 210 North C Street, Madera, for occupancy by herself and
Ingle. The owner testified that he gave her only one key. The
police officers found a key to this apartment on Ingle's person.
They went to these premises about 10 p.m. the night of the
arrest, and were admitted by Mrs. Ingle. They searched it
with her consent. They were looking for marijuana and found
it in sufficient quantity to make about 250 cigarettes. The
search having been made pursuant to the consent of Mrs. Ingle,

416

the evidence found was admissible. ■■■■ As stated in *People* v. *Carter,* 48 Cal.2d 737, at page 746 [312 P.2d 665]) : "When the husband is absent from the home, it is the wife who controls the premises, the ordinary household property, the family automobile, and with her husband's tacit consent determines who shall and who shall not enter the house on business or pleasure and what property they may take away with them." No contention is made that the consent was not freely given. It has been held that the consent of a wife to a search is not involuntary merely because at the time it was given her husband was in custody and confined in jail. (*People* v. *Dominguez,* 144 Cal.App.2d 63 [300 P.2d 194] ; *People* v. *Lujan,* 141 Cal.App.2d 143, 147-148 [296 P.2d 93] ; *United States* v. *Pugliese,* 153 F.2d 497.)

■■■■ Ingle's contention that he was deprived of his constitutional right to counsel lacks substance here. The record shows that Attorney Barcroft, an experienced member of the bar, was appointed by the court to represent Ingle in February, 1958. The same attorney was appointed to represent codefendants Garcia and Adame, defendant Sondra Ingle being represented by other private counsel. At the arraignment on March 7, 1958, Garcia pleaded guilty. Barcroft, appearing with and on behalf of Ingle and Adame, asked for a week's continuance and for the appointment of other counsel. The request was denied. No representation was made to the court then or at subsequent appearances in court of Ingle, Adame and Barcroft on March 14, March 17, and April 18 in connection with setting the trial date, that there was any objection to Barcroft's representation of these two defendants or that there was any conflict of interest in their respective defenses. A few days before the May 22 trial date Ingle and Adame informed Barcroft that they no longer wanted him to represent them, and that they would defend themselves rather than have his continued representation. At the commencement of the trial Barcroft advised the court of this situation, and asked to be relieved of responsibility. The court carefully questioned, cautioned, and advised each of the defendants as to the peril involved in this decision upon their part. Each stated that he wanted to proceed in his own behalf.

Ingle relies on *People* v. *Robinson,* 42 Cal.2d 741, 745-747 [269 P.2d 6], and *Glasser* v. *United States,* 315 U.S. 60, 75-76 [62 S.Ct. 457, 86 L.Ed. 680], in support of his contention that he was deprived of the undivided assistance of counsel, and that a choice between having counsel representing conflicting

interests and the accused representing himself was not really a free choice. This is not a case in which a trial court has appointed joint counsel over objection on the ground of diversity of interest between the codefendants. (*Glasser* v. *United States, supra,* 315 U.S. 60; *People* v. *Lanigan,* 22 Cal.2d 569 [140 P.2d 24, 148 A.L.R. 176].) Nor was counsel forced upon two nonconsenting defendants. Here counsel had requested on unspecified grounds that he be relieved of his appointment over two months before trial. Ingle had several opportunities in court to express his dissatisfaction with counsel, to indicate that there might be some conflict of interest, or to request a postponement of the trial date as set, to obtain independent counsel. When he did object on the morning of the trial he did not indicate that the interests of himself and Adame were in conflict, and the circumstances were not such as to indicate to the trial judge that there was any conflict. When the right to counsel has been freely and intelligently waived, an accused has not been deprived of the right to representation by counsel. (*In re Martinez,* 52 Cal.2d 808, 814 [345 P.2d 449].) The dilatory tactic indulged in by Ingle in this matter is of itself sufficient from which to imply a waiver of right to independent counsel. (*People* v. *Rocco,* 209 Cal. 68, 73 [285 P. 704].)

 With reference to the claimed denial of the appellant's right to the process of court to compel the attendance of witnesses, the clerk's transcript contains a document entitled ''Request for Subpoenas'' which lists the names of several persons. It is unsigned. No request was made at the trial for a continuance to secure the attendance of Garcia or of any other witness. The record is devoid of anything to show that the trial court was at any time cognizant of or refused to honor the request for process.

 The final point raised on this appeal is that Ingle was prejudiced by the remark of the trial court that ''We are in a situation where Garcia has purchased these cigarettes from somebody.'' This remark was made during a ruling on the exclusion of evidence obtained in the three earlier January marijuana transactions. Ingle contends that this statement constitutes error since the record does not contain any direct evidence that Garcia obtained the cigarettes from a third party.

The trial court has a right to comment on the evidence, but the jury must remain the exclusive trier of the fact. The court instructed the jury that it was their exclusive province to con-

sider the evidence and arrive at a determination of the facts, that they were not to consider any statements of the court not supported by the evidence, and that the jury should disregard anything said or done that might suggest that the court favored one side over the other. While the court did not specifically admonish the jury to disregard the particular statement referred to by Ingle, it would appear to have been sufficiently covered by the court's subsequent instructions, and if erroneous, no prejudice ensued to the substantial rights of defendant Ingle.

The only close questions presented on this appeal are whether Ingle effectively waived his right to counsel and whether there was reasonable or probable cause for his arrest and subsequent search. The facts support the conclusion that there was an effective waiver of counsel. They also support the conclusion that the trial court did not abuse its discretion in determining that there was reasonable or probable cause for the arrest and search. The facts present a situation upon which reasonable men might possibly differ in reaching a conclusion as to probable cause, but it cannot be said as a matter of law that there was not sufficient ground upon which the officers could form a strong suspicion and conscientiously entertain the belief that Ingle was committing or had just committed an offense proscribed by section 11500 of the Health and Safety Code. No prejudicial error, miscarriage of justice, or deprivation of any constitutional right appears. Defendant Ingle was fairly tried and justly convicted.

The judgment is affirmed.

Gibson, C. J., Traynor, J., Schauer, J., Spence, J., McComb, J., and Peters, J., concurred.

Appellant's petition for a rehearing was denied February 17, 1960.