[Crim. No. 8459. Second Dist., Div. Four. Apr. 5, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. DONALD BAIRD FERGUSON, Defendant and Appellant.

Frank Duncan for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and David M. Rothman, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—In an information filed by the District Attorney of Los Angeles County, defendant was charged with the crime of illegal possession of marijuana in violation of section 11530 of the Health and Safety Code. Defendant entered a plea of not guilty. Defendant personally and all counsel waived trial by jury. Defendant was found guilty as charged. A motion for new trial was denied. Probation was granted for a term of three years, the first 90 days of which to be spent in the county jail. Defendant appeals from the judgment (order granting probation).

On December 20, 1961, Police Officers Johnson and Klinger were riding in an unmarked patrol car. At approximately 1 p.m. they observed Lonnie Simpson and Louis Plute standing on the front lawn in front of Simpson's apartment, talking. The officers got out of their car and spoke to them. Officer Johnson noticed marks on Simpson's arm which appeared to have been caused by "injection of a needle and administering of heroin or a drug." Simpson, upon being

questioned about the marks on his arm said, "Oh, those aren't marks." Johnson thereupon arrested him and, on searching his person, found a marijuana cigarette in his pocket. Officers Johnson and Klinger conducted a search of his garage and then went upstairs and searched his apartment. They had no warrant either to arrest or search Simpson or to search his apartment.

While in the apartment, the telephone rang but when Officer Johnson answered it the party calling hung up. A short time later, the phone rang again. The officer told Simpson to answer it, holding the receiver so he could hear, and to ask who was calling. Simpson complied and the party calling said it was Dennis. When asked by Simpson what he wanted the voice said "When can we make a score, man?" Simpson was told to answer the question by saying at about 9 o'clock tonight, which he did. He was then told to ask what the party calling was doing. The voice said: "We are sitting here getting straight, man. We are listening to music and getting straight." In narcotic parlance "getting straight" means getting under the influence of narcotics. Simpson, under Johnson's instruction, then asked and received the caller's phone number.

After the phone conversation, the officers checked the phone number given to Simpson and found it was registered to a person named Ferguson, living at an apartment on Venice Boulevard. The officers went to the apartment and were told by the manager that the Fergusons lived there and that they had a young son who was at that time in the apartment with a couple of other boys. The officers went to the door of the apartment and could hear voices and music playing. They opened the door, which was unlocked, and entered. They had no warrant to search. Officer Johnson testified that there was a strong odor of marijuana smoke in the room which was then occupied by three persons: defendant, Jim Reed, and Dennis Boyd. They were all placed under arrest and ordered to stand up. They appeared to be under the influence of marijuana. Officer Johnson searched them and found nothing; but in ashtrays 15 seeds were found among other debris. (In the opinion of Richard Bingle, a qualified chemist, the seeds were marijuana.) Officer Johnson testified that, at the time of the search, he asked defendant if he had any more marijuana seeds in the room and defendant stated that there was nothing left; "everything we had we smoked up."

*Officer Rudolph Pena testified that at the police station the*

next day when he asked defendant whether he had been smoking marijuana on the day of his arrest, defendant in the presence of the two persons arrested with him stated freely and voluntarily that he had smoked a marijuana cigarette before the other two arrived and that the latter had not smoked any marijuana.

Defendant did not take the stand or put on witnesses in his defense.

The principal questions raised in this appeal are: 1. Was the officer's arrest of Simpson and attendant search of his person and residence illegal for lack of probable cause for the search and arrest? 2. Assuming the arrest and search were unlawful, does defendant, as a third person, have standing to object to the use of evidence obtained thereby?

In considering the first question, we must bear in mind the basic principles of law involved as illustrated in the following decisions:

When an arrest or search is made without a warrant, the burden rests on the prosecution to show a proper justification. (*Tompkins* v. *Superior Court,* 59 Cal.2d 65, 67 [27 Cal.Rptr. 889, 378 P.2d 113].)

"Reasonable or probable cause is shown when a man of ordinary care and prudence, knowing what the officer knows, would be led to believe or conscientiously entertain a strong suspicion of the guilt of the accused. [Citations.]" (*People* v. *Steffano,* 177 Cal.App.2d 414, 417 [2 Cal.Rptr. 176]; *People* v. *Morris,* 211 Cal.App.2d 274, 277 [27 Cal. Rptr. 129].)

In considering the question of reasonable or probable cause, the court must look to the facts and circumstances presented to the officer at the time he was required to act. (*People* v. *Hollins,* 173 Cal.App.2d 88, 92 [343 P.2d 174].)

It is well established that a search cannot be justified by what it turns up. (*Tompkins* v. *Superior Court, supra,* 59 Cal.2d 65, 68.) As stated in *People* v. *Brown,* 205 Cal. App.2d 188, 192 [22 Cal.Rptr. 835], ". . . the fact that the search of defendant's person ultimately disclosed that she possessed a narcotic cannot justify a search or arrest which is without legal foundation."

It is conceded by the People in the case before us that no case has been found involving an arrest without a warrant made solely on the basis of the observation by an officer of the presence of what he believes to be hypodermic marks. In the case of *People* v. *Jaurequi,* 142 Cal.App.2d 555 [298

P.2d 896], cited by the People, police officers arrested a suspect after observing hypodermic needle marks on his arm. However, in that case the suspect had been known to the officers as a user of narcotics and further, had been known to deal in narcotics. The court stated at page 561, ". . . the officer could reasonably have believed that the defendant's status had not changed because of what he saw from the markings on the defendant's arms; and when considered with the fact that the officer knew the defendant to be a narcotic user and dealer, he was in our opinion reasonable in making the arrest."

In *People* v. *Rios,* 46 Cal.2d 297 [294 P.2d 39], the police officer's observation of fresh hypodermic needle marks on the suspect's arm, was bolstered by the suspect's admission, before the arrest, that his last heroin "fix" was about two weeks previously, from which the court held, on page 298, ". . . it could be inferred that he had possessed heroin. . . ."

In *People* v. *Hollins,* 173 Cal.App.2d 88, 90 [343 P.2d 174], the arresting officer testified that he had known the suspect prior to the arrest as being connected with the narcotics world, that just prior to the arrest he was in the company of a known addict and that on a prior occasion he had arrested the suspect after observing needle marks on his arm.

There is nothing in the record of the case before us which establishes that Simpson was known to the officers as being connected in any way with narcotics. The only basis shown for any suspicion is the observation by the officers of what he testified appeared to him to be needle marks. The People contend that the officers' suspicions were reasonably aroused by Simpson's answers to their questions before his arrest. He was asked, "Are you strung out?" (Meaning, addicted to narcotics.) Simpson said, "No." The officers asked why he was all marked up and Simpson replied, "Oh, those aren't marks." At this point the arrest took place.

We hold the People have not carried their burden in this case of showing reasonable or probable cause for the arrest and we therefore find the arrest to be illegal. Following the rule that a search cannot be justified by what it turns up, the search of Simpson's apartment was likewise unlawful. (*Tompkins* v. *Superior Court, supra,* 59 Cal.2d 65, 68; *People* v. *Brown, supra,* 205 Cal.App.2d 188, 192.)

We turn now to the question of defendant's standing to object to the use of evidence against him which was obtained as a result of the unlawful search of Simpson's apartment.

In *People* v. *Martin,* 45 Cal.2d 755 [290 P.2d 855], the court

refused to follow the rule established in certain federal courts that only those whose constitutional rights have been violated may object to the introduction of illegally obtained evidence against them. The court stated that the rule excluding evidence obtained by unlawful search and seizure as established in California with the case of *People* v. *Cahan*, 44 Cal.2d 434 [282 P.2d 905], was to act as a deterrent to prevent lawless enforcement of the law. The court stated on page 760 that lawless enforcement occurs ". . . whenever the government is allowed to profit by its own wrong by basing a conviction on illegally obtained evidence, and if law enforcement officers are allowed to evade the exclusionary rule by obtaining evidence in violation of the rights of third parties, its deterrent effect is to that extent nullified."

The court cited a number of United States Supreme Court cases which recognize that the purpose of the exclusionary rule is to prevent unlawful conduct by law enforcement officers. (*Walder* v. *United States*, 347 U.S. 62, 64-65 [74 S.Ct. 354, 98 L.Ed. 503]; *United States* v. *Mitchell*, 322 U.S. 65, 70-71 [64 S.Ct. 896, 88 L.Ed. 1140]; *McDonald* v. *United States*, 335 U.S. 451, 456 [69 S.Ct. 191, 93 L.Ed. 153]; *Anderson* v. *United States*, 318 U.S. 350, 356-357 [63 S.Ct. 599, 87 L.Ed. 829].) The court further stated in *People* v. *Martin, supra,* at page 761, that a person's right to object to the use of evidence must be based, ". . . not on a violation of his own constitutional rights, but on the ground that the government must not be allowed to profit by its own wrong and thus [be] encouraged in the lawless enforcement of the law." The court goes on to state that "[s]ince all of the reasons that compelled us to adopt the exclusionary rule are applicable whenever evidence is obtained in violation of constitutional guarantees, such evidence is inadmissible whether or not it was obtained in violation of the particular defendant's constitutional rights." (See also *People* v. *Gale,* 46 Cal.2d 253, 257 [294 P.2d 13].)

In *People* v. *Brown, supra,* 205 Cal.App.2d 188, 192, this court had occasion to touch on the problem stating the exclusionary rule ". . . must be brought into operation . . . to protect not solely the rights of defendant before this court but primarily the constitutional rights of all persons to be secure in their homes, persons and effects." (See also *People* v. *Johnson,* 153 Cal.App.2d 870, 877 [315 P.2d 468]; *People* v. *Mills,* 148 Cal.App.2d 392, 403 [306 P.2d 1005].)

 Under the theory of the exclusionary rule as laid

down in *People* v. *Cahan,* 44 Cal.2d 34 [282 P.2d 905], defendant clearly does have standing to object to the introduction of the evidence obtained as a result of the unlawful arrest and search of Simpson and his apartment. With this evidence excluded no conviction of defendant would have been possible for no probable cause would have existed to permit the entry of defendant's apartment.

Judgment of conviction is reversed.

Burke, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied April 25, 1963, and respondent's petition for a hearing by the Supreme Court was denied May 29, 1963.