[Crim. No. 3218. First Dist., Div. Two. Aug. 27, 1956.]

THE PEOPLE, Respondent, v. RUBEN GRAFF, Appellant.

Benjamin M. Davis and Lionel Browne for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, William M. Bennett, Deputy Attorney General, Thomas C. Lynch, District Attorney (San

Francisco), and Franklin Campbell, Assistant District Attorney, for Respondent.

THE COURT.—Appellant was found guilty by the court sitting without a jury on all three counts of an information charging violation of Penal Code, sections 337a, subdivision 2 (keeping a certain apartment for the purpose of recording and registering bets on horse races), 337a, subdivision 4 (recording and registering such bets), and 337a, subdivision 6 (laying and accepting such bets) all on July 13, 1955. After motions for arrest of judgment and for a new trial had been denied, appellant was given a suspended sentence of one year in the county jail on each count to run concurrently and placed on probation on condition of paying a fine. He appeals from the judgment and the order denying his motion for a new trial.

On July 13, 1955, at 11:30 a. m. appellant was arrested on suspicion of bookmaking by police officers attached to the Bureau of Special Services, Bookmaking Detail, when he stepped out of apartment 512 of the apartment house at 1472 Filbert Street in San Francisco, which apartment was then leased by a Miss Morris, who was present in the apartment at the time of the arrest. Appellant who was carrying under his arm a San Francisco Examiner of that day opened to the racing section of the sports section was searched and in a pocket were found two slips of paper one of which, as explained by appellant, contained entries of horse race bets. He told the officers that an addition of figures totaling $250 on said slip represented the total amount of bets that he had taken that day in that apartment. It was his total business: ". . . I was just finished when you got me." He had been in business at that apartment for two months. His average had been $175 a day. The police officer who testified to the above also declared that there had been no violence, threats or promises and such is not disputed.

Prior to making the arrest the officers had that morning listened in on the occupants of apartment 512 from the adjacent apartment 501, by arrangement with the apartment manager. They had gone to apartment 501 after they had seen appellant enter the apartment building, had applied amplifying equipment containing a microphone and amplifier to the wall between the two apartments and had used it from 10 a. m. on to listen to the sounds emanating from apartment 512. They had heard from time to time the voice of a man

and of a woman, mainly of a man, and at certain times a sound as of dialing of a telephone number. After such a dialing sound the male voice was heard to say: "Hello. This is Oscar R. I am only going to give you one, Super Upper, second race at Saratoga. It goes in ten minutes. I'll call you in ten minutes and give you the rest." Later, again after the sound of a telephone being dialed, a male voice and the following conversation: "Johnny, this is Oscar R. You got the rest? Yes." "What's the bet?" "Mamru. That's a total of six. What are they, Bernie? They are all shorties. 142 *good.*" Other conversations testified to were (by male voice): "Johnny L. I have got something for you in the first," and after hesitation "Prom Hall." (pause) "In the eighth Attavar." (pause) "Forty" (pause) "Right on the barrel head" (pause) "About two, okay." In a conversation between man and woman not on the telephone the male voice said.: "There is a guy we have never been able to beat but we finally beat him. He has to wait for a loan to come through to pay off." and "We can't lose. For every bet we win we make fifty per cent. For every bet we lose we only lose five per cent. . . . etc." At approximately 11:30 the dialing sound was heard and the male voice: "What can I do? I can't get rid of it all. I'll be out of here in five minutes." Then the arrest was made.

Appellant contends in substance that the listening of the officers with the amplifying equipment was an unreasonable invasion of appellant's privacy and an illegal search against which he was protected by the Fourth and Fourteenth amendment of the federal Constitution and by article I, section 19 of the state Constitution, that it compelled him to testify against himself in violation of the Fifth amendment of the federal Constitution and article I, section 13 of the state Constitution and that it violated section 605 of the Federal Communications Act prohibiting divulging of intercepted communications; that the search of appellant without a warrant was illegal; that under the new rule of *People* v. *Cahan* (1954), 44 Cal.2d 434 [282 P.2d 905] and *People* v. *Tarantino* (1955), 45 Cal.2d 590 [290 P.2d 505] evidence so illegally obtained is inadmissible for any purpose, and that then there was no proof of the corpus delicti which would permit the use of appellant's extrajudicial admissions. It is undisputed that sufficient objections have been made to permit review of said contentions. However, we have found them without merit.

There can be no doubt that the unknown listening to what

happened in a private apartment by means of electronic equipment, an aggravated form of eavesdropping, is a serious invasion of the privacy of the occupants of the apartment, but it does not follow that the cited constitutional provisions provide guaranties against it and that evidence so obtained is inadmissible. The question has not been decided in California under the new exclusionary rules, but has been decided against appellant in the federal courts where said exclusionary rules have been in force since *Weeks* v. *United States* (1914), 232 U.S. 383 [34 S.Ct. 341, 58 L.Ed. 652, L.R.A. 1915B 834]. In *Goldman* v. *United States* (1942), 316 U.S. 129 [62 S.Ct. 993, 86 L.Ed. 1322] federal agents from an adjacent office, by means of a "detectaphone," a device similar to the one herein used, placed against the partition wall, heard what defendants spoke in their office and what one of them said talking over the telephone. The Supreme Court held (at p. 135) that the use of the detectaphone was not a violation of the Fourth Amendment, on the authority of *Olmstead* v. *United States* (1928), 277 U.S. 438 [48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376]. The evidence in the latter case was largely gathered by the interception by federal officers of telephone messages of the defendants by trapping their lines in the streets, without trespass upon property of the defendants. The court held that the Fourth Amendment by its language was not applicable because it relates to the search of material things "persons, houses, papers and effects only." "There was no searching. There was no seizure. The evidence was secured by the use of the sense of hearing and that only. There was no entry of the houses or offices of the defendants." (P. 464.) Congress might make such intercepted messages inadmissible in evidence by direct legislation but the courts could not give such unusual meaning to the Fourth Amendment (pp. 465, 466). It was also held in the Olmstead case that the Fifth Amendment was not involved because no compulsion induced defendants to talk over their telephones; they acted voluntarily without knowledge of the interception (p. 462). In the Goldman case, *supra*, it was also held that in that case there was no violation of section 605 of the Federal Communications Act, which protects the message during the course of its transmission by the instrumentality of transmission, not at the moment it is spoken into or after it is received from said instrumentality (316 U.S. at pp. 133-134; to the same effect *People* v. *Malotte*, 46 Cal.2d 59, 63-64 [292 P.2d 517]). The Olmstead and Goldman cases were followed in *On Lee* v.

*United States* (1952), 343 U.S. 747 [72 S.Ct. 967, 96 L.Ed. 1270]. In *People* v. *Malotte, supra,* 46 Cal.2d at p. 63, our Supreme Court expressly abstained from deciding whether the Goldman and Olmstead cases had been "unsettled" by *Irvine* v. *California* (1954), 347 U.S. 128 [74 S.Ct. 381, 98 L.Ed. 561], because the facts of the Malotte case were distinguishable. As the facts of our case cannot be distinguished from those of the Goldman case, we must consider whether the Irvine case shows that Goldman does not now represent the federal law. Irvine certainly does not overrule Goldman expressly. Neither are the decisions inconsistent. Irvine is not concerned with the question whether the Fourth Amendment protects against invasion of privacy without trespass or search and seizure in the historical sense. In the Irvine case evidence had been admitted which had been obtained by means of serious trespasses among which repeated invasions of a home to place microphones and prolonged listening in by means of said devices. The California District Court in 1953, prior to the Cahan case, *supra,* affirmed the conviction and the Supreme Court denied a hearing (113 Cal.App.2d 460 [248 P.2d 502]). The problem before the United States Supreme Court was whether to apply the general rule of *Wolf* v. *Colorado,* 338 U.S. 25, 33 [69 S.Ct. 1359, 93 L.Ed. 1782] "That in a prosecution in a State court for a State crime the Fourteenth Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure" or to accept an exception for extreme invasions (*cf. Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396], holding obtaining of evidence by forced stomach pumping violative of the due process clause of Fourteenth amendment) or to overrule *Wolf* v. *Colorado.* The majority of the court affirmed, on the basis of the Wolf rule—four justices dissented expressing their positions in three different opinions. We conclude that the Irvine decision does not affect the authority of Goldman and Olmstead and that so far as the federal constitutionality and legality of the evidence is concerned those two cases are binding on us. The Irvine case itself shows that in our case there is no violation of the due process clause of the Fourteenth Amendment.

The state constitutional provisions relied on by appellant are identical with the federal ones. In our state the recent exclusionary rules of the Cahan case, *supra,* and the cases which followed it, were mainly based on the decisions of the United States Supreme Court, which long since had excluded

evidence obtained by illegal search and seizure from federal criminal cases. Although our Supreme Court in the Cahan case, *supra* (44 Cal.2d at p. 450) has announced that it might eliminate needless refinements, distinctions or limitations of the federal rule, both in restricting and in recognizing the right to conduct searches and seizures, no case is known to us in which it has actually extended the exclusion of evidence further than the United States Supreme Court had done and specifically it has not done so with respect to the question before us. Under these circumstances it is not for this intermediate appellate court to take such initiative without any supporting authority, although unlimited eavesdropping by police officers on citizens in their houses and offices might remind us more of a police state than of American freedoms. The subject matter, moreover, seems better fitted for legislative regulation than for judicial regulation under the due process clause of the state Constitution. Too many problems of a legislative character seem involved. Should all evidence obtained by eavesdropping be excluded or only evidence obtained by eavesdropping with the aid of mechanical devices? If, as held in the Olmstead case, eavesdropping without trespass is not a search or seizure, all search warrant legislation probably is not directly applicable. Should nevertheless a search warrant legalize eavesdropping with or without mechanical devices or should a special warrant be required? Should such detection be exceptionally legalized without warrant in the prevention of an imminent major crime? Although these problems are not all directly involved in this case they all would necessarily require solution if once the methods here used were declared illegal and the evidence thereby obtained excluded. We do not think that we should take the initiative in a matter of such consequence. ██ We hold that in the absence of any authority supporting appellant's contention in this respect, the admittance of the evidence complained of was not error.

██ The legality of the search of appellant without a warrant depends on whether the arresting officers, before searching him had "reasonable cause" to believe that appellant had committed a felony or any crime in their presence, without considering what the arrest and search thereafter turned up. (*People* v. *Brown*, 45 Cal.2d 640, 642 et seq. [290 P.2d 528]; Pen. Code, § 836.) Reasonable or probable cause has been given different definitions to the effect that it means known circumstances which, although they may leave room for

some doubt, will incline a reasonable man to believe that the charge is true (*People* v. *Brite*, 9 Cal.2d 666, 687 [72 P.2d 122]; *People* v. *King*, 140 Cal.App.2d 1, 6 [294 P.2d 972]). ■ We hold that the conversations overheard by the officers and stated herein before, together with the fact that appellant came out of apartment 512 shortly after the male voice had said that he would be out of there within five minutes amounted to such reasonable cause, to believe that appellant had violated Penal Code, section 337a. The language overheard must have been especially significant for the officers who were members of the bookmaking detail and therefore can be presumed to be conversant with horserace betting and the names of race horses. ■ As violation of section 337a is punishable by imprisonment in the county jail or state prison, it is under Penal Code, section 17, considered as a felony for every purpose up to the judgment and by a judgment other than imprisonment in the state prison it loses that character prospectively only, without retroactive effect. (*Doble* v. *Superior Court*, 197 Cal. 556, 576 [241 P. 852]; *In re Miller*, 218 Cal. 698, 700 [24 P.2d 766].) It is therefore irrelevant to the legality of the arrest and search whether a crime is considered to have happened in the *presence* of the officers who listened at the apparatus. ■ As the arrest and search were legal under the preceding authorities the slips of paper found on appellant were correctly admitted into evidence.

"Extrajudicial admissions of a defendant can be used against him when there is independent prima facie evidence of the corpus delicti (citations). Slight proof of the corpus delicti is sufficient for this preliminary purpose (citations)." (*People* v. *Gem Hang*, 131 Cal.App.2d 69, 71 [280 P.2d 28].) ■ The conversations overheard, together with one of the slips found on appellant and received in evidence of which Officer Siegfried to whose qualifications as an expert appellant stipulated, testified that it contains records of bets on horse races, constituted more than slight independent proof of the corpus delicti, the violation of the three provisions of Penal Code, section 337a, charged. The admissions which raised the proof beyond a reasonable doubt were therefore admissible.

■ Appellant's final contention that the so-called expert evidence of Officer Siegfried should have been rejected both on the score of lack of qualification and as being without probative value is totally devoid of merit. Appellant stipulated to his qualifications and made no objections to his testimony,

or move that it be stricken. Its probative value was for the trier of facts.

Judgment and order affirmed.

Petition for a rehearing was denied September 11, 1956, and appellant's petition for a hearing by the Supreme Court was denied September 25, 1956. Carter, J., Traynor, J., and Schauer, J., were of the opinion that the petition should be granted.